IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE; PAMELA GELLER; and ROBERT SPENCER,<br><br>Plaintiffs,<br><br>v.<br><br>SUBURBAN MOBILITY AUTHORITY for REGIONAL TRANSPORTATION ("SMART"); GARY L. HENDRICKSON, individually and in his official capacity as Chief Executive of SMART; JOHN HERTEL, individually and in his official capacity as General Manager of SMART; and BETH GIBBONS, individually and in her official capacity as Marketing Program Manager of SMART,<br><br>Defendants. | 2:10-cv-12134-DPH-MJH<br><br>**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION & BRIEF IN SUPPORT**<br><br>Hon. Denise Page Hood<br><br>Magistrate Judge Hluchaniuk |

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
Richard Thompson, Esq. (P21410)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001
Fax: (734) 930-7160
*Co-Counsel for Plaintiffs*

LAW OFFICES OF DAVID YERUSHALMI, P.C.
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
P.O. Box 6358
Chandler, AZ 85246
david.yerushalmi@verizon.net
(646) 262-0500
Fax: (801) 760-3901
*Co-Counsel for Plaintiffs*

Plaintiffs American Freedom Defense Initiative (hereinafter referred to as "FDI"), Pamela Geller, and Robert Spencer (collectively referred to as "Plaintiffs"), by and through their undersigned counsel, hereby move this court for a Temporary Restraining Order (TRO) and/or preliminary injunction pursuant to Fed. R. Civ. P. 65 and E.D. Mich. LR 65.1 in order to prevent irreparable injury to Plaintiffs' fundamental rights and interests.

In support of this motion, Plaintiffs rely upon the pleadings and papers of record, as well as their brief filed with this motion and the declaration and exhibits attached hereto.

For the reasons set forth more fully below, Plaintiffs hereby request that this court temporarily/preliminarily enjoin the enforcement of Defendants' restriction on Plaintiffs' right to engage in political and religious speech in a public forum created by Defendants based on the content and viewpoint of Plaintiffs' message (hereinafter "Free Speech Restriction"). Defendants' Free Speech Restriction prohibited Plaintiffs from displaying advertisements on SMART buses that travel along major roads and highways throughout various counties in Michigan, including Macomb, Oakland, and Wayne.

As stated in the attached certificate of service, on June 16, 2010, a copy of this motion and brief was *personally served* on Defendants SMART, Hertel, and Gibbons, along with the service of the summonses and Complaint.  Defendants' counsel accepted service on behalf of Defendants.

Pursuant to E.D. Mich. LR 7.1, on June 17, 2010, Plaintiffs' counsel sought but did not receive concurrence from Defendants' counsel in the relief sought by this motion.

WHEREFORE, Plaintiffs hereby request that this court grant this motion for a TRO/preliminary injunction.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ David Yerushalmi
David Yerushalmi, Esq.

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE; PAMELA GELLER; and ROBERT SPENCER, <br><br>        Plaintiffs, <br><br>    v. <br><br> SUBURBAN MOBILITY AUTHORITY for REGIONAL TRANSPORTATION ("SMART"); GARY L. HENDRICKSON, individually and in his official capacity as Chief Executive of SMART; JOHN HERTEL, individually and in his official capacity as General Manager of SMART; and BETH GIBBONS, individually and in her official capacity as Marketing Program Manager of SMART, <br><br>        Defendants. | 2:10-cv-12134-DPH-MJH <br><br> **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION** <br><br> Hon. Denise Page Hood <br><br> Magistrate Judge Hluchaniuk |

**ISSUE PRESENTED**

Whether denying Plaintiffs the right to engage in private political and religious expression in a public forum created by Defendants based on the content and viewpoint of the message causes irreparable harm to Plaintiffs sufficient to warrant temporary/preliminary injunctive relief.

## CONTROLLING AND MOST APPROPRIATE AUTHORITY

*Connection Distributing Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985)

*Elrod v. Burns*, 427 U.S. 347 (1976)

*Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37 (1983)

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*,
    163 F.3d 341 (6th Cir. 1998)

**BRIEF IN SUPPORT OF MOTION**

This case challenges Defendants' restriction on Plaintiffs' right to engage in political and religious speech in a public forum created by Defendants based on the content and viewpoint of Plaintiffs' message (hereinafter "Free Speech Restriction").   Defendants' Free Speech Restriction prohibited Plaintiffs from displaying advertisements on SMART buses that travel along major roads and highways throughout various counties in Michigan, including Macomb, Oakland, and Wayne.

**RELEVANT FACTS**

Plaintiff FDI is an organization that is incorporated under the laws of the State of New Hampshire.  Plaintiffs Pamela Geller and Robert Spencer co-founded FDI.  Plaintiff Geller is the Executive Director, and Plaintiff Spencer is the Associate Director.  Plaintiffs Geller and Spencer engage in political and religious speech through FDI's activities, including FDI's religious freedom bus and billboard campaigns.  (Geller Decl. at ¶¶ 2-3 at Ex. 1).

FDI's objective is "to go on the public relations offensive when legal, academic, legislative, cultural, sociological, and political actions are taken to dismantle our basic freedoms and values."  Plaintiffs promote this objective by, *inter alia*, sponsoring religious freedom bus and billboard campaigns.  To that end, Plaintiffs purchase advertising space on bus lines operated in cities throughout the United States to express their religious freedom message, which states as follows: "Fatwa on your head?  Is your family or community threatening you?  Leaving Islam? Got questions?  Get answers!"  The message also includes the following website address: RefugeFromIslam.com.  (Geller Decl. at ¶¶ 4-11, Ex. B at Ex. 1).

Pursuant to FDI's bus campaign, Plaintiffs sought advertising space on SMART vehicles for its religious freedom message.  (Geller Decl. at ¶¶ 11-14 at Ex. 1).

Defendant SMART is a governmental agency.  It was created under Michigan law, and it receives funding from the federal government, the State of Michigan, and the counties of Macomb, Oakland, and Wayne.  (Geller Decl. at ¶ 14, Ex. H at Ex. 1).

As a governmental agency that receives state and federal funds, SMART is mandated to comply with federal and state laws, including the First and Fourteenth Amendments to the United States Constitution.  (*See* Geller Decl. at ¶ 14, Ex. H at Ex. 1).

According to SMART's "Advertising Guidelines," "First Amendment free speech rights require that SMART not censor free speech and because of that, SMART is required to provide equal access to advertising on our vehicles."  Consequently, as a matter of official policy, SMART has intentionally dedicated its advertising space on its vehicles to expressive conduct. (Geller Decl. at ¶ 14, Ex. H at Ex. 1).

Pursuant to its express policy and its established practice, SMART permits a wide variety of commercial, noncommercial, public-service, public-issue, political, and religious advertisements on the outside of its vehicles.  For example, SMART permitted the Detroit Area Coalition of Reason, an atheist organization, to place an anti-religion advertisement on its vehicles.  The atheist advertisement stated the following: "Don't believe in God?  You are not alone."  The advertisement also listed the website (DetroitCoR.org) of the organization.  (Geller Decl. at ¶ 14, Ex. G at Ex. 1).

On or about May 12, 2010, Plaintiffs submitted a request to display their religious freedom message on SMART vehicles.  Plaintiffs' request to display their advertisement met all

of the procedural requirements established by SMART to display such advertisements on its vehicles.  Plaintiffs entered into a contract through SMART's advertising agency, completed all of the requisite forms, and made all of the requisite contractual payments.  (Geller Decl. at ¶ 15 at Ex. 1).

On or about May 24, 2010, Defendants denied Plaintiffs' request and refused to display Plaintiffs' religious freedom message.  Plaintiff Geller immediately contacted Defendant Gibbons, the point of contact for SMART, and asked: "What was it about the ad that was 'not approved' and what would have to be changed?  Please let me know so we can get this campaign on the road."  To this day, no one from SMART, including Defendant Gibbons, has responded to Plaintiffs' questions nor has anyone approved the display of Plaintiffs' religious freedom message.  (Geller Decl. at ¶ 16 at Ex. 1).

## ARGUMENT

The factors to be weighed before issuing a TRO or a preliminary injunction are the same. *See, e.g., Workman v. Bredesen,* 486 F.3d 896, 904-05 (6th Cir. 2007); *Southerland v. Fritz*, 955 F. Supp. 760, 761 (E.D. Mich. 1996).

The standard for issuing a preliminary injunction in this Circuit is well established.  In *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), the court stated:

> In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest.

*Id.; see also Hamilton's Bogarts, Inc. v. Michigan,* 501 F.3d 644, 649 (6th Cir. 2007).  Typically, the reviewing court will balance these factors, and no single factor will necessarily be

determinative of whether or not to grant the injunction.  *Connection Distributing Co.*, 154 F.3d at 288.  However, because this case deals with a violation of Plaintiffs' First Amendment right to freedom of speech, the crucial and often dispositive factor is whether Plaintiffs are likely to prevail on the merits.  *Id*.

**A.      Plaintiffs' Likelihood of Success on the Merits.**

The First Amendment provides in pertinent part that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Plaintiffs' First Amendment right to freedom of speech is protected from infringement by States and their political subdivisions, such as Defendants, by operation of the Fourteenth Amendment.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  Indeed, the freedom of speech is a fundamental right that is essential for the preservation of our republican form of government.  As the Supreme Court has long recognized, "[Speech] concerning public affairs is more than self-expression; it is the essence of self-government."  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citations omitted).  Moreover, Supreme Court precedent "establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."  *Capitol Square Rev. & Adv. Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

The likelihood of success of Plaintiffs' free speech claim is examined in essentially three steps.  First, the court must determine whether the speech in question—Plaintiffs' religious freedom bus advertisement—is protected speech.  Second, the court must conduct a forum analysis as to the forum in question to determine the proper constitutional standard to apply.

And third, the court must then determine whether Defendants' Free Speech Restriction comports with the applicable standard.

As demonstrated below, Defendants' denial of Plaintiffs' request to display their religious freedom bus advertisements on the sides of SMART buses—a public forum created by Defendants—violates Plaintiffs' right to freedom of speech.

**1.      Plaintiffs' Signs Expressing a Religious Freedom Message Are Protected Speech.**

The first question is easily answered.  Conveying a political or religious message with signs constitutes protected speech under the First Amendment.  *See Hill v. Colorado*, 530 U.S. 703, 714-15 (2000) ("[S]ign displays . . . are protected by the First Amendment."); *United States v. Grace*, 461 U.S. 171, 176-77 (1983) (demonstrating with signs constitutes speech under the First Amendment).  This includes signs posted on bus advertising space.  *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) (affirming preliminary injunction on First Amendment grounds requiring state agency to accept union's proposed wrap-around bus advertisement).

**2.      Forum Analysis.**

To determine the extent of Plaintiffs' free speech rights in this matter, the court must next engage in a First Amendment forum analysis.  "The [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).  Forum analysis has traditionally divided government property into three categories: traditional public forums, designated public forums, and nonpublic forums.  *Cornelius,* 473 U.S.

at 800.   Once the forum is identified, the court must then determine whether the speech restriction is justified by the requisite standard.  *Id.*

On one end of the spectrum lies the traditional public forum.  Traditional public forums, such as streets, sidewalks, and parks, are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515 (1939).

Next on the spectrum is the designated public forum, which exists when the government intentionally opens its property for expressive activity.  *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 44 (1983).  As the Supreme Court stated, "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."  *Cornelius*, 473 U.S. at 802.

In a traditional or designated public forum, restrictions on speech are subject to strict scrutiny.  *Id.* at 800 ("[S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. . . .  Similarly, when the government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling government interest.").

At the opposite end of the spectrum is the nonpublic forum.  The nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication."  *Perry Educ. Ass'n,* 460 U.S. at 46.  In a nonpublic forum, the government "may reserve the

forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* Thus, even in a nonpublic forum, a speech restriction must be reasonable and viewpoint neutral to pass constitutional muster. *Id.*

The forum at issue here is a designated public forum. A designated public forum is created when the government "intentionally open[s] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To discern the government's intent, courts "look[] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," as well as "the nature of the property and its compatibility with expressive activity." *Id.*

In this case, SMART has designated its advertising space as a public forum based on its express policy *and* its practice. According to SMART's "Advertising Guidelines," "First Amendment free speech rights require that SMART not censor free speech and because of that, SMART is required to provide equal access to advertising on our vehicles." Additionally, SMART has permitted an atheist organization to display an anti-religious message on its vehicles. Thus, Defendants have intentionally designated the advertising space on SMART buses as a public forum for a wide range of political and religious messages. *See United Food & Commercial Workers Union, Local 1099*, 163 F.3d at 355 (concluding that the advertising space on a bus system was a public forum and stating that "[a]cceptance of political and public-issue advertisements, which by their very nature generate conflict, signals a willingness on the part of the government to open the property to controversial speech"); *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225 (7th Cir. 1985) (concluding that the

advertising space on a bus system became a public forum where the transit authority permitted advertising on "a wide variety of commercial, public-service, public-issue, and political ads"); *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998) (concluding that the advertising space on the outside of buses was a public forum where the transit authority permitted "political and other non-commercial advertising generally"). Furthermore, it is without question that the "nature of the property"—the advertising space—is "compatible" with Plaintiffs' proposed expressive activity. *See United Food & Commercial Workers Union, Local 1099*, 163 F.3d at 355 (concluding that the advertising space on a bus system was a public forum and stating that "acceptance of political and public-issue speech suggests that the forum is suitable for the speech at issue"—a pro-union message). Consequently, as a matter of official policy and practice, SMART has intentionally dedicated its advertising space on its vehicles to expressive conduct, thereby creating a public forum for Plaintiffs' speech.

### 3. Application of the Appropriate Standard.

#### a. Content-Based Restriction.

In a designated public forum, similar to a traditional public forum, the government's ability to restrict speech is sharply limited. The government may enforce reasonable, *content-neutral* time, place, and manner regulations of speech if the regulations are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Perry Educ. Ass'n,* 460 U.S. at 45. However, *content-based* restrictions on speech, such as the restriction at issue here, are subject to strict scrutiny. *Cornelius*, 473 U.S. at 800. That is, "[s]peakers can be excluded from a public forum only when the exclusion is

necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* For "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, content-based restrictions "are presumptively unconstitutional." *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998). The government may not "impose special prohibitions on those speakers who express views on disfavored subjects" or on the basis of "hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. St. Paul*, 505 U.S. 377, 386-92 (1992); *see Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (holding that the government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express more controversial views).

In this case, Defendants' "Free Speech Restriction" was content-based. To determine whether a restriction is content-based, the courts look at whether it "restrict(s) expression because of its message, its ideas, its subject matter, or its content." *Consolidated Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980). Here, Defendants provided <u>no</u> content-neutral basis for denying Plaintiffs' request to display their religious freedom message. And Plaintiffs met all of the procedural requirements for displaying the message. Consequently, Defendants' rejected the message based on its content without a compelling—let alone legitimate—reason for doing so.[1]

---

[1] In fact, Defendants' restriction is viewpoint based, which is the most egregious form of discrimination that is *impermissible* in all speech forums, including nonpublic forums. Here, Defendants allow messages on the subject of religion, as evidenced by the atheist message that was permitted. Yet, Defendants denied Plaintiffs the right to express their particular viewpoint on this permissible subject in the same forum. *See Cornelius*, 473 U.S. at 806 (stating that

### b.     No Compelling Reason for Rejecting Plaintiffs' Religious Freedom Message.

It is evident that Defendants' rejected Plaintiffs' message because they objected to its content and viewpoint.  Defendants may have presumed that others might object to the content as well.  However, a listener's (or, in this case, viewer's) reaction to speech is <u>not</u> a content-neutral basis for regulation.  *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992).  "The First Amendment knows no heckler's veto."  *See Lewis v. Wilson,* 253 F.3d 1077, 1082 (8th Cir. 2001).

While restrictions of speech because of the "secondary effects" that the speech creates are sometimes permissible, an effect from speech is not secondary if it arises from the content of the speech.  "The emotive impact of speech on its audience is not a 'secondary effect.'"  *Boos v. Barry*, 485 U.S. 312, 321 (1988) (opinion of O'Connor, J.)

In *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), for example, the Supreme Court famously stated,

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging.  It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.  That is why freedom of speech . . . is . . . protected against censorship or punishment. . . .  There is no room under our Constitution for a more restrictive view.

*Id*. at 4.

---

viewpoint discrimination occurs when the government "denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"); *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003) ("[If speech] fall[s] within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker.").

Therefore, the fact that Plaintiffs' speech may actually offend some persons does not lessen its constitutionally protected status; it enhances it. "The fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (citations omitted); *Forsyth County,* 505 U.S. at 135 (noting that speech cannot be "punished or banned, simply because it might offend a hostile mob"); *Hill*, 530 U.S. at 715 & 710, n.7 ("The fact that the messages conveyed by [the signs] may be offensive to their recipients does not deprive them of constitutional protection.").

"[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975). Rather than censoring the speaker, the burden rests with the viewer to "avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Cohen v. California*, 403 U.S. 15, 21 (1971). As the *Cohen* Court noted, "[W]e cannot indulge the facile assumption that one can forbid particular words [or messages, as in this case] without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words [or messages] as a convenient guise for banning the expression of unpopular views." *Id.* at 26.

In fact, First Amendment protection even extends to regulatory schemes that would allow a disapproving citizen to silence a disagreeable speaker by complaining on other, apparently neutral, grounds. In *Reno v. ACLU*, 521 U.S. 844, 880 (1997), the Supreme Court held that the prohibition on knowingly communicating indecent material to minors in Internet forums was

invalid because it conferred "broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old-child . . . would be present."

Thus, pursuant to the First Amendment, the government is not permitted to affirm the heckler; rather, it must protect the speaker and punish those who react lawlessly to a controversial message.  As the Sixth Circuit observed, "[The government] has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take reasonable action to protect . . . persons exercising their constitutional rights."  *Glasson v. Louisville*, 518 F.2d 899, 906 (6th Cir. 1975).

In sum, Defendants cannot, consistent with the Constitution, prohibit Plaintiffs' religious freedom message because they or other viewers might find it offensive.  Otherwise, the government "would effectively empower a majority to silence dissidents simply as a matter of personal predilections."  *Cohen*, 403 U.S. at 21.

**B.      Irreparable Harm to Plaintiff without the TRO/Preliminary Injunction.**

Plaintiffs will be irreparably harmed without the TRO/preliminary injunction. Defendants' restriction on Plaintiffs' private speech deprives Plaintiffs of their fundamental First Amendment rights.  It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Connection Distributing Co.*, 154 F.3d at 288; *Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." (citing *Elrod*)).

**C.      Whether Granting the TRO/Preliminary Injunction Will Cause Substantial Harm to Others.**

In this case, the likelihood of harm to Plaintiffs is substantial because Plaintiffs intend only to peacefully exercise their First Amendment right to freedom of speech in a public forum, and the deprivation of this right, even for minimal periods, constitutes irreparable injury.

On the other hand, if Defendants are restrained from enforcing their free speech restriction against Plaintiffs, Defendants will suffer no harm because the exercise of constitutionally protected expression can never harm any of Defendants' or others' legitimate interests. *See Connection Distributing Co.*, 154 F. 3d at 288.

In the final analysis, the question of harm to others as well as the impact on the public interest "generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation. . . ." *Connection Distribution Co.*, 154 F.3d at 288. For if Plaintiffs show that their First Amendment right to freedom of speech has been violated, then the harm to others is inconsequential.

**D.      The Impact of the TRO/Preliminary Injunction on the Public Interest.**

The impact of the TRO/preliminary injunction on the public interest turns in large part on whether Plaintiffs' constitutional rights are violated by the enforcement of Defendants' Free Speech Restriction. As the Sixth Circuit noted, "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating that "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties").

As noted previously, the enforcement of Defendants' restriction is a direct violation of Plaintiffs' fundamental rights protected by the First Amendment.  Therefore, it is in the public interest to issue the TRO/preliminary injunction.

In the final analysis, Defendants' restriction on Plaintiffs' private speech in a public forum violates fundamental constitutional rights.  Plaintiffs are presently irreparably harmed by Defendants' Free Speech Restriction, and without a TRO/preliminary injunction, this harm will continue.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this court grant this motion.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ David Yerushalmi
David Yerushalmi, Esq.

*Counsel for Plaintiffs*

14

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2010, a copy of the foregoing PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION & BRIEF IN SUPPORT was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

I further certify that a copy of the foregoing was personally served on Defendants SMART, Hertel, and Gibbons on June 16, 2010, along with copies of the summonses and the Complaint.  Defendants' counsel accepted service on behalf of Defendants.

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)